MAR 31 2025 AM9:08
RCUD - USDC - FLMD - ORL

AF Approval __JM__                                Chief Approval __MF__

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA

    v.                                            CASE NO. 6:25-cr- 85 - JSS - LHP

RICHARD F. MCDANIEL II

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Sara C.

Sweeney, Acting United States Attorney for the Middle District of Florida, and the

defendant, Richard F. McDaniel II, and the attorneys for the defendant, David Haas

and Vincent A. Citro, mutually agree as follows:

A.   **Particularized Terms**

    1.   Count(s) Pleading To

        The defendant shall enter a plea of guilty to Count One of the

Information. Count One charges the defendant with interstate stalking, in violation

of 18 U.S.C. § 2261A.

    2.   Maximum Penalties

        Count One carries a maximum sentence of five years' imprisonment, a

fine of $250,000, a term of supervised release three years, and a special assessment

of $100. With respect to certain offenses, the Court shall order the defendant to make

restitution to any victim of the offense(s), and with respect to other offenses, the

Defendant's Initials _____

Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3.    Elements of the Offense(s)

The defendant acknowledges understanding the nature and elements of the offense(s) with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

First:    The defendant used any interactive computer service or electronic communication service or electronic communication system of interstate commerce to engage in a course of conduct toward another person;

Second:    The defendant acted with the intent to harass or intimidate another person; and

Third:    The defendant's conduct either: (a) placed that person in reasonable fear of death and serious bodily injury to a person; or (b) caused, attempted to cause, and would be reasonably expected to cause substantial emotional distress to that person.

4.    Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States

Defendant's Initials _____    2

Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6. <u>Restitution to Victim of Offense of Conviction</u>

Pursuant to 18 U.S.C. §§ 2264 and 3663(a), defendant agrees to make full restitution to D.D. and N.K., victims of the offense of conviction. Further, pursuant to 18 U.S.C. § 3664(d)(5), the defendant agrees not to oppose bifurcation of the sentencing hearing if the victims' losses are not ascertainable prior to sentencing.

7. <u>Guidelines Sentence</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8. <u>Acceptance of Responsibility – Three Levels</u>

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The

Defendant's Initials _____     3

defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

**B.** **Standard Terms and Conditions**

1. **Restitution, Special Assessment and Fine**

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such

Defendant's Initials _____ 4

counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2. **Supervised Release**

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. **Immigration Consequences of Pleading Guilty**

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future,

Defendant's Initials _____    5

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five

Defendant's Initials _____                    6

years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and

Defendant's Initials _____    7

defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    <u>Middle District of Florida Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

Defendant's Initials _____    8

9.    <u>Filing of Agreement</u>

This agreement shall be presented to the Court, in open court or <u>in camera</u>, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    <u>Voluntariness</u>

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant

Defendant's Initials _____    9

questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement.  The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty.  The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.   <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _____   10

13.   Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this _28th_ day of _March_ 2025.

 

SARA C. SWEENEY
Acting United States Attorney

_____
Richard F. McDaniel II
Defendant

_____
Matthew J. Del Mastro
Special Assistant U.S. Attorney

_____
David Haas
Attorney for Defendant

_____
Michael P. Felicetta
Assistant United States Attorney
Chief, Orlando Division

_____
Vincent A. Citro
Attorney for Defendant

Defendant's Initials _____                    11

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 6:25-cr-

RICHARD F. MCDANIEL II

<u>PERSONALIZATION OF ELEMENTS</u>

<u>First:</u>      Did you use any interactive computer service or electronic
            communication service or electronic communication system of
            interstate commerce to engage in a course of conduct toward D.D.;

<u>Second:</u>   Did you so with the intent to harass or intimidate D.D.; and

<u>Third:</u>    Did your conduct cause, and would be reasonably expected to cause,
            substantial emotional distress to D.D.?

Defendant's Initials _____                12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 6:25-cr- 85 -JSS-LHP

RICHARD F. MCDANIEL II

## FACTUAL BASIS

### Background

In the summer of 2020, the defendant and Victim 1, D.D., began a long-distance, romantic relationship that lasted until the summer 2023. At this time, D.D. was living in the Middle District of Florida with her two teenage sons, and the defendant was living in Texas and then Colorado.

In May 2023, D.D. moved from Deland to New Smyrna Beach. To assist with the move, the defendant sent D.D. a total of $4,000 in three installments ($1,500 on May 9, 2023, $1,500 on May 9, 2023, and $1,000 on May 19, 2023). The defendant maintains this $4,000 was a loan that D.D. was expected to pay back. D.D. maintains she never asked the defendant for the $4,000 or to borrow any money from him during the relationship.

On June 24, 2023, the defendant and D.D. had a verbal altercation at D.D.'s home in New Smyrna Beach. D.D.'s teenage son, N.K., was present for the altercation and called 911. The defendant voluntarily left the home after the police arrived and D.D. requested that he be trespassed.

Defendant's Initials ____                     13

The defendant and D.D. continued to maintain some contact until September 2023, when D.D. told the defendant to leave her alone and cut off contact with him, blocking his phone number and social media accounts. Despite this, the defendant persisted in contacting D.D. incessantly through phone calls to her personal and work phones, emails to her personal and work email accounts, social media, and mail. He also began directly messaging and posting public comments on the social media accounts of D.D.'s family, friends, and acquaintances, all to harass and intimidate D.D. The defendant's messages are vulgar, degrading, and intimidating, and focus on accusing D.D. of sexual promiscuity and other alleged character flaws. The harassment has caused D.D. substantial emotional distress, reflected by, among other things, D.D. moving her physical residence out of fear of the defendant. The defendant has attempted to intimidate D.D., most notably by emailing her to tell her he had found her new address. The defendant's harassment campaign continued for over a year, until he was contacted by FBI agents on October 24, 2024.

**Online and Telephonic Stalking of D.D.**

Between September 2023, and October 24, 2024, the defendant contacted D.D. directly numerous times daily via phone calls to her personal and work phones, emails to her personal and work email accounts, and social media sites such as LinkedIn, and Marco Polo. During this time, he sent D.D. over 1,000 emails. D.D. did not respond to the defendant's emails but they did speak multiple times by phone as described in the factual basis. After the defendant informed her that he intended to file a civil lawsuit against her (described further below), D.D. called the defendant on

Defendant's Initials _____                    14

October 12, 2023, and they spoke for an hour about the impending lawsuit and their

relationship. She answered one of his phone calls in late May 2024, and told him to

leave her alone.

Below are examples of emails the defendant sent from

rfmcdaniel@hotmail.com to both D.D.'s personal and work email addresses:

- September 4, 2023, titled "Have you blocked me now?" and stating "[D.D.] I only called [N.K. (Victim 2)] because I was worried about you. If I'd known you were ignoring me again then I'd never had called him. But I thought I would hear from you again tonight so when I didn't I got worried – especially because your phone was going straight to voicemail."

- November 20, 2023, "Why are you so afraid to call me back?"

- November 25, 2023, titled "Your message..." and stating "Whatever it is, it isn't getting through. Is ignoring me supposed to tell me to go away? I would prefer if you just tell me. If you do, then I will go away and not contact you anymore – no calls, no email, no LinkedIn. I begged you not to ignore me when we spoke in August. It's as if you know how much it hurts me."

- December 12, 2023, "Why can't I detach from you? I'm strong willed but addicted to you. It's driving me mad."

- December 14, 2023, "I know you read my messages. Why can't you just respond or call me? Seriously, what's the issue? What are you so afraid of? Why are you so resistant to me?"

- December 15, 2023, "I barely get two hours of sleep per night then lie awake in bed shaking uncontrollably. Yet I'm sure you're sleeping just fine – probably assisted by the warm body next to you. I can't understand how someone can be so cold. I'm not sure if you're calculating. I know for sure that you're cruel. You've read the anguish in my emails. You've heard the pain in my voice in the LinkedIn messages. You've seen the tears in the pictures I've sent. Yet you don't care... In the meantime, you've cast your Facebook net far and wide looking for the next guy..."

Defendant's Initials _____    15

- December 19, 2023, "Can you just tell me how you turn it off? That's all I want to do. I don't want to think of you 24/7. I don't want to refer to my girlfriend when talking to other people. I don't want to continue shopping for engagement rings."

- In May 2024, D.D. attended N.K.'s high school graduation mass in Daytona Beach. Photos from the mass were published on the high school's Facebook page. On May 23, 2024, the defendant emailed D.D. a photograph from the mass, which shows her in the backdrop next to her current boyfriend. He also sent her a cropped, zoomed-in image of her and the boyfriend stating "You know you could've just told me. I was holding on thinking there was a glimmer of hope for us."

- On May 24, 2024, the defendant sent D.D. an email with the following: "You are the epitome of a dishonest piece of shit. Anyone with honor would've paid back that loan. Worse yet, your kids have no idea what honor is. Fuck you, whore. How many guys did you fuck before you settled on this one? At least I'm vindicated in that the person I thought you were in 2020 turned out to be who you really are in 2024."

- On May 24, 2024, the defendant sent D.D. an email titled "You could be in Germany." The body of the email stated "Instead of [D.D.'s new address]" and included a photograph of the defendant sitting in what appeared to be a café. D.D. did does not know how the defendant obtained her new address. D.D. began crying when she received this email, and again when she recounted the incident to FBI agents. She explained that it made her feel intimidated, fearful, and unsafe in her home, and caused her to lose sleep.

- Later on May 24, 2024, titled "I get it" and stating: "I get it. You are one sick motherfucker to whom loyalty means nothing. You are the most disloyal and dishonest person I've ever met. I wrote the most heartfelt things I've ever written to you. There was no reason to ignore my pleas other than you being a lying whore. I'm going to spread the word; [D], if it's the last thing I do in life."

- On June 11, 2024, the defendant emailed D.D. a photograph from N.K.'s graduation of her and her new boyfriend and wrote: "He looks like he makes some money. You too are pretty photographic too. Maybe you can borrow from him to pay me back. It's only right, [D]. Just give me my money so I can move on with my life the same way you have.

Defendant's Initials _____    16

You're unbelievable." Later, that same day he emailed another photo of the new boyfriend, stating: "I was around for 3.5 years of N.K.'s drama. You have no idea how jealous I am that this guy will never have to endure the BS form [*sic.*] him that I did."

- June 24, 2024: Email that included multiple photographs of the defendant with another woman: "I met her in Riyadh. She knows all about us. She knows the pain I feel every single day. She's trying to support me. It's tough on her because all I talk about is you. She's smart. She's successful. But she isn't you."

- August 18, 2024, "I still remember before I was blocked on LinkedIn or Marco, I would send you messages and would know when you were online reading them by the green dot next to your name or the note saying my video was being watched. That feeling was awful - knowing that you were just on the other side of the message reading or watching what I'd just sent but not being able to talk to you or receive a response. For a while I thought it was a good sign and that you might eventually respond. But in reality it seems you were already seeing someone and just reading my messages to use against me.

- September 9, 2024, multiple emails:

  ○ "I actually thought that you'd gotten to a point in your life where you were tired of bouncing from man to man and would make a concerted effort to stay with one (me). I thought you would be willing to compromise and communicate as healthy relationships do. What a damn fool I was. I'm glad I waited to propose. I knew your true colors would eventually show. You couldn't even go six months after me without having a new man. Pathetic. I called it in August 2021 – you're just another whore from my past not worthy of a man like me. You are pure evil."

  ○ "What kind of piece of shit takes advantage of someone's generosity the way you did me? Because you're fucking impetuous and a whore who can't keep her pants on."

  ○ "You're good. You gaslit me until the VERY end. You were cheating yet had the nerve to call me hateful and fucked up. You probably also lied on October 12 when I asked you if you were seeing anyone. I'd put money on you having been on at least one date at that point. You are a fucking machine when it comes to

Defendant's Initials _____    17

all things men: dating, sex, charming, you name it."

- September 14, 2024, titled "Totally used me" and stating: "Six weeks later you enabled your piece of shit fatherless kid when he called the police. How do you live with yourself? You are the most selfish cunt I've ever known."

- October 2, 2024, titled "Abortion" and starting: "I'm watching the VP debate and they're talking about abortion. It made me think about that decision you made to abort Chris Gleason's baby. It must have been difficult. But then again, I don't know anything about you because you lied so much. It might've been the easiest decision you ever made. Or perhaps you've forgotten about your abortion because that's what you do to control your image. That's why you don't know how many men you've slept with."[1]

- October 3, 2024, titled "Liar" and stating "I want EVERYONE to know who and what you are. You've gotten away with your lies and manipulation and ruining of lives for too long."

- October 4, 2024, titled "The next time..." and stating "I intend to sue you for intentional infliction of emotional distress and defamation of character. I am researching if I have any cause of action over what happened in Maine in 2004... As part of my suit, I will call several witnesses [lists names of D.D.'s friends, family, and associates]... The sole purpose of calling the witnesses will be to establish your character. One intended effect of the lawsuit is to get your malign behavior into the public record. It will be out there for everyone to see. It would behoove you to read over some of the things I've said about and sent to you. Read some of the things I've sent to Molly and Peter."

On November 16, 2023, D.D. received a notification from Amazon that

someone who knew her password attempted to long into her account from an Apple

iPhone in Denver, Colorado. The defendant lived in Denver during their relationship

and he now lives in Broomfield, Colorado, which is about 18 miles north of Denver.

---

[1] D.D. explained to FBI agents that she lost a baby due to birth defects and she was devastated over the loss.

Defendant's Initials _____    18

D.D. attempted to call the defendant, on November 16, 2023, after receiving the Amazon notification but they did not connect.

## Stalking Related to D.D.'s Employment

In addition to contacting D.D. on her personal accounts, the defendant regularly contacted her on her work email and cell phone. Throughout the charged period, D.D. has been employed as a vice president at a national bank.

On December 17, 2024, FBI agents interviewed D.D.'s direct supervisor, M.H. M.H. explained she has been D.D.'s direct supervisor since March 2021. She knew that D.D. had dated the defendant and that they had broken up. Following the breakup, the defendant began sending emails to D.D.'s corporate email account. D.D. reported them to M.H. because they were vulgar and disparaging. M.H. recalled the defendant calling D.D. names such as "hoe" and "slut" and saying she would "spread her legs for anyone." He would then tell D.D. he couldn't live without her and needed her back.

M.H. described that D.D. would become very upset and cry when she told her about the emails. She recalled at least five instances in which D.D. had called her crying about the harassment. She gave D.D. time off at least 30 times due to the stress she experienced from the harassment. M.H. observed a negative impact on D.D.'s work, specifically difficulty remembering things and focusing on work. M.H. estimated that the defendant sent D.D. approximately 400 emails in September and October 2023 alone.

Defendant's Initials _____        19

Sometime in late 2023, the defendant sent M.H. a private message on LinkedIn asking for D.D.'s new address so he could serve her. M.H. stated she had never met the defendant and did not know how he found her on LinkedIn. She described his profile name as "Rick McDaniel," with a profile picture of an American flag. She blocked him and removed everyone on her profile affiliated with the bank to prevent him from contacting other bank employees.

M.H. reported that the defendant stopped sending emails to D.D.'s work account around January 2024, when the first restraining order was in place (discussed below). After that was lifted in February 2024, he began sending the emails and contacting D.D. again. Around May 2024, D.D. was on medical leave and the defendant was repeatedly calling her on her corporate cell phone. M.H. took it upon herself to have D.D.'s corporate phone number changed. Indeed, the defendant had called D.D.'s work phone over 1,000 times since February 2024. D.D. told FBI agents that the change in work number caused her to lose client contact information, which has negatively impacted her work.

**Defendant's Attempts to Locate D.D. and Harass Her Through the Mail**

In October 2023, D.D. contacted her landlord, M.F., for permission to break her lease, reporting that she was afraid the defendant might travel to the home to harm her or her boys. She was particularly concerned about the defendant harming N.K. because he blamed N.K. for their breakup and the 911 call. D.D. ended up moving to Daytona Beach.

Defendant's Initials _____        20

While in the process of moving, a flower delivery arrived at D.D.'s New Smyrna Beach residence. M.F. told the delivery driver that D.D. no longer lived there, and the delivery service in turn notified the sender (the defendant) she had moved. The defendant tracked down M.F.'s phone number, called him, and asked him to tell him D.D.'s new address. The defendant told M.F. he was suing D.D. for $4,000 she had stolen from him and that he could subpoena M.F. if he didn't disclose her new address. M.F. still refused to provide the address.

On October 16, 2023, the defendant filed a civil lawsuit against D.D. in Volusia County Civil Court, seeking repayment of $4,000 that he alleged he had loaned D.D. in May 2023. The defendant listed D.D.'s old New Smyrna Beach address, apparently not yet aware of her knew address. On November 3, 2023, he filed an amended statement of claim in which he corrected D.D.'s address to her parents' address in Port Orange, Florida. In associated correspondence to the Court, the defendant wrote "I have learned that she moved from the original address listed on the complaint."

In July 2024, D.D. received a letter from the defendant with a return address in Falls Church, Virginia, but which was post marked in Denver, Colorado on July 1, 2024. The letter stated "I forgive you but will never forget all that you have taken from me and what you owe me."

Also in July 2024, D.D. received a post card to her Daytona Beach address from the defendant from Italy, which stated: "I came. I prayed. I cried. I tried to heal. I wish you cared more."

Defendant's Initials _____     21

Also in July 2024, D.D. received an Amazon package from the defendant containing sexual lubricant. During his FBI interview (discussed below), the defendant explained that this was accident, and that he had intended to send the lubricant to his current girlfriend.

On October 23, 2024, the defendant purchased a gift card for $250 to The Med Spa in New Smyrna Beach and had it mailed to D.D.'s new address with the note "Always & Forever."

### Online Harassment Through Social Media Accounts of Third Parties

In addition to contacting D.D. directly, the defendant attempted to reach and harass her through social media accounts of her family, friends, and associates.

In September 2023, one of D.D.'s friends, S.T., received a Facebook friend request from "[D.D.] Latourkinseydobis." This is a combination of the last names of D.D.'s ex-husbands. The profile picture depicted D.D. in a biker vest and jean shorts, and the cover photo was zoomed in on her breasts. The defendant also contacted S.T. on Facebook, using the profiles "Jolie Goldie" and "Irma Narciss." On June 20, 2024, the defendant, as "Irma Narciss," commented on a public post made by S.T., and stated "[D.D.] Cheating, lying, and stealing aren't ok but if you're going to do it then just own it. For some it's just part of who they are. Sometimes you just get caught."

The defendant also posted a negative review on S.T.'s business Facebook page under the pseudonym "CG Carfield," writing:

[S.T.] is one of the most self-centered, egotistical, and self-promoting people in the business. Everything out of her mouth is me, my, or I. She uses people for her own gain and she's as fake as it gets. Her Google reviews are from friends. She makes and posts promotional videos while driving down the highway and blocks people who point it out. And the Jesus stuff? Ha ha ha…

On September 12, 2024, using "Jolie Goldie," the defendant sent the following Facebook message to D.D.'s friend, Y.E.:

[D.D.] stole $4K from her ex-boyfriend literally just before she narcissistically abandoned him. She was also, characteristically, cheating on him when she asked for the money. But she managed to move on to her next man rather successfully. History has proven she's adept at bouncing from man to man. She doesn't understand commitment the same way most do. She left her first husband 90 days after marrying him and her third marriage to an unemployed biker gang deviant was only two years. She's introduced her poor kids to six different men in ten years… She is a full-blown narcissist who needs some serious help. Who spends their kids' tuition money on breast implants when she's in massive debt? Maybe her fourth husband will be the solution…

Similarly, the defendant has continually contacted J.R., another friend of D.D., by text message and Facebook to talk negatively about D.D. After the breakup, the defendant continually called J.R. to tell her his side of the story and tell her that D.D. was wrong and a narcissist. J.R. eventually blocked the defendant's number and Facebook account, which she identified as "Billy Cannon."[2] Sometime around April 2024, she told the defendant to stop contacting her.

Using "Jolie Goldie," the defendant posted on the public Facebook page of a restaurant in Maine, accusing D.D. of sleeping with one of the restaurant owners. The owners, T.S. and C.S., are personal acquaintances of D.D.

---

[2] The defendant utilized "Billy Cannon" as a Facebook pseudonym since 2008.

Defendant's Initials _____                    23

On June 28, 2024, the defendant used the Facebook profile "RJ Reynolds" to comment on a two-year-old post by D.D.'s hairdresser, A.B., depicting a photo of D.D. The defendant wrote: "[D.D.] this cut and color was a perfect timing. She's started finding her new supply just after this as she prepared to leave her husband just two months later."

On August 31, 2024, the defendant sent an email to D.D.'s ex-husband (and N.K.'s father), A.K., cc'ing his current wife, in which he extensively disparaged D.D., including discussing her sexual activity with him and other men.

In September 2024, the defendant contacted M.L., one of D.D.'s male friends. On October 7, 2024, M.L. made a public post on his Facebook page of him and a date at a black-tie affair. The defendant sent M.L. a message via Facebook Messenger, commenting that his date was "much better than [D.D.]" The defendant also texted M.L. on his personal phone number, which M.L. had never provided him.

**Injunctions**

On December 28, 2023, D.D. filed a petition for a temporary injunction/protective order against the defendant for stalking in Volusia County Circuit Court.

Minutes from a January 31, 2024, hearing on the temporary injunction indicate the parties reached an agreement whereby the defendant would dismiss his

lawsuit against D.D. and, in turn, D.D. would dismiss the injunction.[3] Consistent with this, the defendant moved to dismiss his civil case against D.D. on January 31, 2024. On February 5, 2024, D.D. moved to dismiss her temporary injunction against him. That motion was granted the following day, February 6, 2024.

The defendant, however, resumed contacting D.D. by phone and email by March 2024, and escalated over the next several months (he sent 28 emails in March, 163 in April, 265 in May, and 296 in June). In late April 2024, D.D. called the lawyer who had represented the defendant during the first injunction, D.L., to report that the defendant had started up again. D.L. told her he would contact the defendant, and then on April 29, 2024, D.L. sent her the following text: "Hey [D]. I made contact with Rick. Explained to him what we discussed and how he [sic.] been given an opportunity to stop before he's back in court. He did mention the cards being sent and wanted me to give you a heads up, but you knew that. Hopefully, I got the message across."

The defendant continued to call, text, and email D.D. and post about her on social media. On May 7, 2024, D.D. texted D.L.: "Well, Rick started to again on May 2nd. Just two days after your conversation with him. 9 emails. 3 emails just today. Text messages. Once again text messages to my work phone under another

---

[3] The defendant, who appeared by Zoom, took a photograph/screenshot of D.D., who appeared in person for the hearing, and later emailed it to her in May 2024, months after that injunction had been dismissed.

Defendant's Initials _____     25

phone number. So now I blocked that one. Ughhh. Thank you for trying but I guess he is not listening to anyone but the law." D.L. responded: "I tried my best..."

On July 9, 2024, D.D. filed for a second temporary injunction/protective order in Volusia County Circuit Court. In a letter to the Court dated October 1, 2024, the Broomfield, CO Police Department wrote that it had attempted to serve the defendant 19 times at his residence since July 2024, leaving business cards in his front door that were never retrieved. Neighbors reported they had not seen the defendant during this time, and the defendant maintains that he travels frequently for work and was unaware of these service attempts. The defendant was eventually served on October 24, 2024. On November 14, 2024, the Court issued a "Stipulated Final Judgment of Injunction for Protection Against Stalking" following a hearing attended by both D.D. and the defendant (via Zoom), and the defendant's attorney, D.L. The no-contact order runs through November 13, 2025, and requires the defendant to surrender any firearms.

**Stalking of N.K.**

In the fall of 2023, the defendant made multiple attempts to contact D.D.'s teenage son, N.K., by phone and online. Specifically, he sent him a friend request on Instagram, using the profile "Mike Oehlersen" (michael.oehlersen). On November 13, 2023, the defendant sent N.K. a message on the messaging app "Signal," which the defendant then deleted before N.K. could read it.

In June 2024, N.K. began receiving many calls and texts from the defendant using spoof phone numbers, as well as Instagram messages and Zelle requests.

Defendant's Initials _____                    26

During D.D.'s interview with FBI agents in September 2024, N.K. called her and informed her that he had received six missed calls from the defendant that morning. He told D.D. his stomach was hurting from the stress it caused him, and he was going to skip class.

On June 14, 2024, the defendant sent N.K. a Zelle request for $4,000, with the message: "security deposit and first month's rent."

On June 30, 2024, N.K. received text messages from the defendant stating: "Do you have any idea how many men your mom cheated on Rick with?" and "Do you think it's OK for your mom to take money from men and not pay them back?" and "Or what if she pays back by spreading her legs?"

On July 3, 2024, N.K. received an Instagram message from the defendant as "Mike Oehlersen" stating: "What's new gay boy? Work on those muscles all you want but you still have weak character and your mom will always be a whore."

On July 10, 2024, N.K. received the following text message from the defendant: "Why would your mom hide her first marriage from you? She'll lie to literally anyone, including her own children, to protect her image. Remember the time you opened that Amazon box with Astro Glide and your mom said it must've been a mistake. It wasn't! It was for her 'activities.'"

On July 4, 2024, N.K. received the following text from the defendant: "Next time you drive that Grand Cherokee think of your mom leaning over from the passenger seat to take care the driver if you know what I mean. It happened many many times."

Defendant's Initials _____        27

On July 9, 2024, N.K. received the following text from the defendant:

> Isn't there something sick about a woman who falls in love so quickly and easily then brings those men around her kids? That sort of narcissistic behavior has to do some real long term damage to her children and their ability to have lasting relationships. Who accepts a proposal from a man while with another man, then leaves him 90 days later? She repeated that pattern a year later with husband #2. How many men do you think your mom has been with? She doesn't even know.

On September 28, 2024, the defendant sent N.K. another Zelle request for $4,000, this time with the message: "Because your mom stole from me and neither of you ungrateful people deserves my money."

Also on September 28, 2024, N.K. received the following text from the defendant:

> Your mom doesn't even know how many men she's slept with, bro. What're your thoughts on her bouncing from man to man and sleeping with your friends' dads? And she was cheating on Rick with Peter and lord knows who else. Gross. Isn't it kind of messed up that she was dating Rick when your senior year started and she took another man to your graduation? She couldn't even go a few months without new dick. You made her life a living hell.

Two hours later he received the following text from the defendant: "You're an ungrateful twat so it's no surprise you couldn't find a father figure. Even your own dad wanted nothing to do with you. Your mom sure knows how to pick em."

On October 14, 2024, the defendant used "michael.oehlersen" to post the body worn camera footage of N.K. from the night N.K. called the police on the defendant in July 2023. The defendant wrote a caption for the video stating: "This kid is a shameless liar just like his mom. He can't look the cops in the eye. They even know he is lying." When he posted this, the defendant tagged numerous friends of

Defendant's Initials _____    28

N.K., so they were notified and saw the posts. He also friend-requested N.K.'s ex-girlfriend from high school, and when she accepted the request, he sent her video. Several of N.K.'s friends reached out to N.K. to ask him about video. D.D. told FBI agents N.K. was an "emotional wreck" after learning about this. D.D. said she was scared for her and N.K.'s safety and felt like she was unable to escape the defendant.

D.D. wrote to FBI agents:

> Rick continues to create a feeling of fear by his cyberstalking and bullying. This is impairing ultimately effecting [N.K.'s] ability to feel safe at college and is affecting his health. He feels Rick is out to get him and by posting this video is a direct threat from Rick to both N.K. and myself. He is going to stop at nothing and will continue to inflict pain and suffering. I am afraid for my sons and my life. Rick McDaniel is an armed Federal Agent with a gun and a badge. He can travel on planes and carry in all areas. I am pleading with the authorities to take immediate action to protect my family against this predator... I am fearful for my life, my son's life. Rick will not stop and just keeps going. He is out to create hate and discontent, resulting in severe emotional distress. I am not sleeping, eating and am in a constate state of fear and stress. I am constantly afraid and feel like I am being hunted by this predator every day.

Besides experiencing stomach aches, N.K. has lost sleep and has experienced fear that the defendant will come after him. Now a freshman at in college, he has reported that the stress caused by the defendant has negatively impacted his grades and that he has sought counseling.

## Defendant's FBI Interview

On October 24, 2024, the defendant participated in a voluntary, recorded telephonic interview with FBI agents. The defendant stated that he began a long-distance relationship with D.D. in 2020, while he was living in Texas and she was in

Defendant's Initials _____    29

Florida. He claimed he lent her $4,000 in 2023, with an agreement for her to pay him back. He stated that he filed the small claims case for the money she owed him and that she filed for the injunction three weeks before the small claims case was going to be heard. He stated that he filed the small claims case due to wanting to both recoup his money and get back together with D.D.

The defendant admitted to sending D.D. the Germany email. He claimed to have found her new address on an open-source search. He could not explain why he sent D.D. flowers on her birthday, and he was going to ask his counselor about it. He also admitted to sending D.D. other gifts after their breakup, including coffee and a cookie. He admitted sending her sexual lubricant, but stated it was an accident, explaining that he had intended to send it to his current girlfriend but used the wrong address in his Amazon account.

The defendant admitted that D.D. told him she was done with their relationship and to stop contacting her in September 2023. The defendant admitted to sending a lot of emails to D.D. since they broke up, and he confirmed that she has never responded to him via email. He acknowledged knowing that D.D. had blocked him on social media and that he understood that was a way of her telling him to leave her alone. The defendant admitted using a spoof app to contact D.D. via cell phone because she had blocked his number. He admitted to buying D.D. an unsolicited plane ticket to accompany him to Paris in September 2023, which she did not accept.

Defendant's Initials _____                30

The defendant admitted to creating fictitious Facebook profiles (CG Carfield, Jolie Goldie, and others he couldn't remember) to contact friends and acquaintances of D.D., including A.K., J.R., S.T., Y.E., T.L., and others. His motivation was to tell these people that D.D. was not the honest person or victim she portrayed herself as. He admitted to making a fake Facebook profile of D.D. using a zoomed in image of her chest, and then using it to comment negatively about her on other people's profiles. He explained that his hope was that these people would "cut her off" or contact her and that would have an effect on her.

He admitted to creating the Instagram account, Michael ("Mike") Oehlersen, and using it to contact N.K. on Instagram. He admitted to sending the message described above where he called N.K. a "gay boy." He also admitted to posting the body worn camera footage Instagram and sharing it with N.K.'s friends. He explained he was motivated by because N.K. called the police on him and for being a "problem" throughout his relationship with D.D. Additionally, he admitted to downloading the photographs from N.K.'s high school graduation from the school's Facebook page and sending them to D.D.

The defendant admitted he had last emailed D.D. that morning. He admitted contacting her several times a day via email. He stated that he had last spoken with D.D. in June or July 2024 when she answered a call from him on her work phone, and that she hung up on him after a very brief conversation in which she called him crazy.

Defendant's Initials _____        31

Asked why he kept contacting D.D., the defendant explained the relationship "really messed [him] up." He said he became suicidal at one point after the breakup because he couldn't understand what happened. He also remained fixated on the notion that D.D. owed him $4,000. He explained that there was a part of him that felt sorry for her and part of him that is very angry at her. He acknowledged that he was trying to cause D.D. the same type of turmoil he had been experiencing since the end of his relationship.

The above is merely a summary of some of the events, some of the persons involved, and other information relating to this case. It does not include, nor is it intended to include, all the events, persons involved, or other information relating to this case.